## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:22-cr-381 (JEB)** |
| **JACOB MICHAEL THERRES,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jacob Michael Therres to 84 months' incarceration, which is the middle of the guideline range—78 to 97 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, the agreed upon $2,000 in restitution, and a mandatory $100 special assessment.

### I.    INTRODUCTION

The defendant, Jacob Michael Therres, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United

1

Therres joined the violent mob storming the U.S. Capitol on the Lower West Terrace where he witnessed violence breaking out around him between rioters and police. He laughed and pointed at an officer who had fallen to the ground and was struck in the head with a metal chair during a fight with rioters. Therres began throwing small objects at the police line in front of him. When another rioter handed him a long, 4"x4", wooden plank, Therres took the plank and threw it at the police line, striking an officer in the head and causing him to briefly lose consciousness and suffer concussion-like symptoms. Rather than being chastened by the injury he caused the officer, Therres continued his assaults on the police. He moved to the inaugural stage area, took a chemical spray gun from an open police crowd control duffle bag, and began spraying the chemical spray at any officer within range. His actions on January 6, 2021 occurred while he was on probation for state law crimes.

The government recommends that the Court sentence Therres to 84 months' incarceration, which is within the advisory Guidelines' range of 78-97 months, for Therres' conviction under 18 U.S.C. § 111(a)(1) and (b). An 84-month sentence reflects the gravity of Therres' criminal conduct and his significant criminal history.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 30 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by

---

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Therres' Role in the January 6, 2021 Attack on the Capitol**

On January 6, 2021, Therres traveled from his residence in Belcamp, Maryland to Washington, D.C. to attend the former president's "Stop the Steal" rally. ECF 30 ¶ 8. After attending the rally, Therres walked to the U.S. Capitol where a large crowd had gathered to protest Congress' certification of the Electoral College vote. *Id*. ¶ 9. He was wearing a blue Trump hat, a red hooded sweatshirt with a black, blue and green backpack, light-colored pants, tennis shoes, and sometimes wearing a white mask. *Id*. Images 1-2, below are open-source images of Therres on restricted Capitol grounds:



*Image 1*

3



*Image 2*

At about 1:30 p.m., Therres joined the crowd that had assembled on the Lower West Terrace and observed police officers actively attempting to keep the crowd away from the building. *Id*. ¶ 10. By approximately 2:10 p.m., Therres had made his way to near the front of a line of rioters up against a police line wearing riot gear on the Lower West Terrace near the inaugural stage. *Id*. ¶ 11. Around that time, violence began breaking out around Therres. *Id*. After witnessing a police officer fall to the ground and being struck in the head with a metal chair during a scrum, Therres pointed and laughed at the officer. Image 3, below, is a screenshot from an open-source video "ZUMA Press Trump Supporters Storm US Capitol"[2] showing Therres pointing and taunting the fallen officer with his laughter:

---

[2] ZUMA Press Trump Supporters Storm US Capitol - John Harrington 10min22sec.mp4, available at https://vimeo.com/500625255.



*Image 3 (Timecode 9:40 – 10:02)*

Therres joined rioters breaching the police line and engaging in assaults of police officers. ECF 30 ¶ 11. Therres began throwing small objects that he picked up off the ground at the police line at least two times. *Id*. Images 4-5, below, are screenshots from a video entitled "WASHINGTON DC INCIDENT (LOTS OF RAW FOOTAGE)"[3] of Therres throwing objects at the police line at approximately 2:12 p.m.:

---

[3]   https://www.youtube.com/watch?v=qSv4oifsb-g&t=649       (No      longer      available);
https://archive.org/details/2S69NcvXrFEfnuJCC



*Image 4 (Timecode 10:46 – 11:10)*



*Image 5 (Timecode 10:46 – 11:10)*

Shortly thereafter, police and rioters began to fight. At around 2:14 p.m., Therres'
codefendant and stepfather, Douglas Steven Wyatt,[4] picked up a long 4"x4" wooden plank off the
ground and handed it to Therres, who took the wooden plank and threw it at the police line. ECF
30 ¶ 12. Images 6-8, below, from the same video in Images 4-5, above, are screenshots showing
Therres hurl the 4"x4" plank at the police line:[5]



*Image 6 (Timecode 11:18 – 11:30)*

---

[4] Douglas Steven Wyatt is currently charged in criminal case number 22-mj-239-1. A complaint
is merely an allegation, and all defendants are presumed innocent until proven guilty beyond a
reasonable doubt in a court of law.

[5] Screenshots taken from ZUMA Press Trump Supporters Storm US Capitol – John Harrington
10min22sec.mp4, https://vimeo.com/500625255 (Timecode: 7:38); *see also* Bodycam footage
from Thomas Robertson case, https://archive.org/details/DZ7CnoNLN7cLMXPJr (Timecode:
18:40).



*Image 7 (Timecode 11:18 – 11:30)*



*Image 8 (Timecode 11:18 – 11:30)*

The large wooden plank thrown by Therres struck the helmet of U.S. Capitol Police ("USCP") Officer J.W., who briefly lost consciousness after the impact. *Id*. J.W. has continued to experience concussion symptoms following January 6, 2021. *Id*.

For all Therres knew, he had severely injured Officer J.W. Rather than being shocked, chastened, or regretful for striking the officer, Therres continued his assaults on the overwhelmed and outnumbered police. At around 2:20 p.m., about six minutes after striking Officer J.W. with the wooden plank, Therres removed a chemical spray gun from a black Metropolitan Police Department (MPD) crowd control duffle bag on the inaugural stage area of the Lower West Terrace. From the inaugural stage, he fired the chemical spray at the officers. *Id*. ¶ 12. Images 6-8, below, from the same video in Images 4-8, above, show Therres take the chemical spray gun from the MPD crowd control duffle bag and spray any police officer within range:[6]



*Image 9 (Timecode 17:09-18:23)*

---

[6]   *See also* JANUARY 6 WASHINGTON, D.C. RIOT, FULL, *available at* https://www.youtube.com/watch?v=AQAY5hUNhWs&t=1468 (Timecode 24:27).



*Image 10 (Timecode 17:09-18:23)*

### *Officer J.W.'s Statements to the FBI*

USCP Officer J.W. was interviewed by the FBI on March 25, 2022.[7] On January 6, 2021,

J.W. was part of the first hard squad unit (squad) activation. The squad utilized riot gear, referred

to as "turtle gear." The squad was activated when an officer radioed for assistance on the West

front. Upon the squad's arrival on the West front, the crowd had already breached the barricades

outlining the restricted area. J.W., other squad members, and other police officers formed a police

line on the Lower West Terrace. J.W. recalls one rioter saying, "I'm going to kill you" and recalls

the group of protestors getting agitated and moving towards the police line. Rioters were pushing

---

[7] If the government receives a victim impact statement prior to sentencing, it will submit it to the
Court for consideration.

through the bike rack barricades, and J.W. utilized his baton on rioters' hands to break their grip from the bike racks. J.W. recalled various small objects being thrown at him and tear gas being deployed.

J.W. got tunnel vision while engaging with rioters who were trying to push through the barricade. Moments later, J.W. was hit in his head with something and fell backwards. J.W. recalled the object being heavy and striking him from above. J.W. recalled wondering if someone had taken control of construction equipment that was in the area. J.W. stated that he lost consciousness for a second or two and recalls falling back onto his rear end and being pulled back behind the line by two other officers. J.W. bit his tongue and was bleeding. J.W. left the line for about 5-10 minutes, took off his helmet, drank water, and tried to regain his composure. J.W. then rejoined the squad, but the line was then pushed back and retreated up the stairs and into the building. J.W. assisted with crowd control for several hours after rejoining the squad.

At around 4:00 p.m., J.W. recalls that the riot began calming down. Some nurses showed up, but J.W. did not seek medical attention at that time. Two days later, J.W. was still dizzy and worried he may have gotten a concussion from the blow to his head. J.W. went to the emergency room for a wellness check, and the hospital staff conducted an MRI. As of March 2022, J.W. reported that he occasionally still gets dizzy but does not know the cause of the ailment.

### *Therres' Statements to the FBI*

On April 5, 2023, after changing his plea to guilty in this case, Therres was interviewed by the FBI. He stated that he saw former President Trump's Tweet about how the rally on January 6, 2021 was "going to be wild," which was the first time Therres had heard about the event. He

planned to attend the rally and support Trump because he believed, at the time, that the 2020 Presidential election had been stolen.

On January 6, 2021, Therres took a train from Maryland to Washington, D.C. He walked to the Ellipse and listened to the speakers, including Trump. Therres then walked to the U.S. Capitol building after hearing Trump over the loudspeaker encouraging people to march to the Capitol.

Upon arrival on restricted Capitol grounds, Therres made his way to the front row of the protestors on the west side of the Capitol. It was initially peaceful, but then rioters started shifting and pushing, which prompted Capitol Police to deploy pepper spray, rubber bullets, and flash bang grenades. Therres moved around the West plaza and eventually made his way to the inaugural stage where, by happenstance, he ran into his stepfather, Wyatt, and half-brother. This was the first time Therres had seen or communicated with them on January 6, 2021. At this point, Wyatt was directly facing the police line and was screaming at the police. Therres did not place blame on his stepfather for his own actions, stating everything he (Therres) did that day was "all my fault" and was a "stupid mistake."

Therres started to throw rubber bullets back at the police. He also threw a Mountain Dew at the police. Wyatt picked up one of the 4"x4" planks on the ground and handed it to Therres, who then threw the plank at the police line. He was not aiming at any particular police officer. He just impulsively threw it at the police line. Soon thereafter, the police line started retreating in response to multiple acts of violence from the crowd, and Therres rushed up on the inaugural stage, where he and Wyatt found a bag containing four or five chemical spray canisters. Therres and

Wyatt both used the sprayers to deploy the chemical irritants at police officers. Shortly after deploying the chemical spray, Therres abruptly left the Capitol grounds. He did not go inside the building.

On the train ride home, Therres kept thinking how crazy the afternoon had been and realized he had gotten caught up in the moment. However, it was a couple days later when he saw the news coverage regarding arrests of rioters that the guilt and shame crept in. Therres thought to himself that "I did bad things" and "was a rioter."

Therres used to have a Twitter account, but he deleted it either shortly before or after January 6, 2021. Therres does not use much social media but did post some pictures (since deleted) from January 6 on his SnapChat. Agents showed Therres a series of pictures. He identified other rioters he knew in the pictures.

## III. THE CHARGES AND PLEA AGREEMENT

On November 18, 2022, a Grand Jury sitting in the District of Columbia returned a seven-count Indictment against Therres, charging him with violating:

- Count One: 18 U.S.C. § 231(a)(3) (Civil Disorder),

- Counts Two and Three: 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon) (relating to the 4"x4" plank and the chemical spray, respectively),

- Count Four: 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon),

- Count Five: 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in

a Restricted Building or Grounds with a Deadly or Dangerous Weapon),

- Count Six: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), and

- Count Seven: 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings).

On January 23, 2023, Therres pleaded guilty pursuant to a plea agreement to Count Two of the Indictment charging him with a violation of 18 U.S.C. § 111(a)(1) and (b).

## IV.  STATUTORY PENALTIES

Therres now faces sentencing on a single count of violating 18 U.S.C. § 111(a)(1) and (b). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Therres faces up to twenty years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Probation Office calculated the combined offense level of the count of conviction as 26, as set forth below.

Count One: 18 U.S.C. § 111(a)(1) and (b)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(3) | Convicted under 111(b) | +2 |
| U.S.S.G. § 3A1.2 | Official Victim | +6 |

| | |
|---|---|
| **Total Offense Level:** | **29** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Adjusted Offense Level:** | **26** |

That calculation is consistent with the parties' stipulations in their plea agreement. *See* ECF 29, at ¶¶ 5(A).

The U.S. Probation Office calculated Therres' criminal history as category III, which the government does not dispute. PSR ¶ 47; ECF 29, at ¶ 5(C). Accordingly, based on the government's calculation of Therres' total adjusted offense level of 26 after acceptance of responsibility, Therres' Guidelines imprisonment range is 78 to 97 months.[8] PSR ¶ 74.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Therres' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Therres' offense were of the

---

[8] The plea agreement in this case states an estimated guideline imprisonment range of 70-87 months. ECF 29 ¶ 5.D. The parties incorrectly calculated Therres' criminal history category by neglecting to include two additional criminal history points under USSG § 4A1.1(d) due to Therres committing the instant offense while on probation for a separate offense. *See* PSR ¶ 46. Therres did not object to the additional criminal history points, and the recommended sentence of 84 months is within the estimated range of the plea agreement.

utmost seriousness, and fully support the government's recommended sentence of 84 months' incarceration.

**B.  Therres' History and Characteristics**

Therres is reportedly currently self-employed as a construction worker. PSR ¶ 66. At age 25, he already has significant and troubling criminal history that places him in Criminal History Category III. Therres has a violent criminal history, and his actions on January 6, 2021 were consistent with that violent history. The number of protective orders entered against Therres, the circumstances surrounding them, and his violations of those protective orders are highly concerning. He has also received several second chance-type sentences. He has failed to take advantage of those chances. Therres' criminal history includes:

- On October 18, 2017, at age 20, Therres was convicted of second-degree assault of his stepfather, Wyatt, after a dispute over access to a shed. Wyatt advised officers he had placed a padlock on a shed at the residence denying access to Therres because it contained drug paraphernalia. Therres then attacked Wyatt by jumping on top of him, attempting to choke him, and gouge his eye out. Therres advised officers that the dispute arose because Wyatt had locked a dirt bike in the shed. Therres was sentenced to one year of jail (suspended) and one year of probation. PSR ¶ 42.

- On October 30, 2017, a victim, A.S., obtained a temporary protective order against Therres, which became a final protective order on November 6, 2017. Therres had sent A.S. sexually explicit threatening letters and stalked her. Therres was ordered to stay at least 100 feet away from A.S. PSR ¶ 43.

- In June 2018, Therres' probation was revoked for violations of the protective orders entered in 2017.

  Police arrived at Wyatt's residence due to a report that Therres was violating the Wyatt protective order by throwing a party at Wyatt's house while he was away. A.S., who also had a protective order against Therres, had reported Therres' by anonymously calling 911. When police arrived at Wyatt's residence, Therres

16

answered the door, and then slammed and locked it. Therres then fled into the woods behind the residence.

After the incident at Wyatt's house, Therres' sister sent A.S. a threatening text message, "You petty ass snitch." A.S. was then made aware of a video posted on social media by Therres showing him urinating on the victim's car, driver's side door, with a banner on the video that read, "Don't snitch on me bitch." A.S. stated that she was terrified by Therres' retaliatory conduct.

In addition to a violation of the Wyatt protective order, Therres was charged with two violations of the A.S. protective order (for the text message and urination on the car), solicit-induce/inhibit testimony, and retaliate - witness. Therres was found guilty of violating a protective order and sentenced to 90 days imprisonment (60 days suspended), and 36 months' probation. PSR ¶¶ 43, 49.

- On August 19, 2019, Therres was charged with burglary-first degree, burglary-third degree, burglary-fourth degree-dwelling, theft: $1,500 to under $25,000, and malicious destruction of property value $1,000.

  The charges stemmed from a burglary of an apartment of an acquaintance of Therres. Therres forcefully broke into the apartment and took a number of items, including computers and a JBL speaker. The stolen items were later discovered in Therres' residence. Therres had asked the victim to lie to the police about the stolen JBL speaker and tell them that the victim left it at his house. Therres admitted that he broke into the victim's apartment with two other people because the victim owed him $90. Therres stated that he would have returned the stolen items if the victim had repaid the $90.

  On April 14, 2021, Therres was convicted on the theft charge and sentenced to five years' imprisonment (suspended), three years' supervised probation, and $4,000 restitution.

  Therres was on probation for this offense when he committed the offense in this case on January 6, 2021. *See* PSR ¶ 46.

- On November 17, 2021, Therres' probation for the 2018 offense was revoked due to unsatisfactory completion of his probation, and he was sentenced to 60 days imprisonment (45 days suspended). PSR ¶ 43. The revocation was not related to the offense in this case.

17

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Therres assaulted and injured a federal police officer with a dangerous weapon multiple times on January 6, 2021. After witnessing another officer fall to the ground and being struck in the head with a metal chair during a scrum on the West front, Therres pointed and laughed at the officer. *See Image 3*. He then started tossing small objects at the police line. After that, he threw a long, 4"x4" plank at a police line and injured USCP Officer, J.W. He did not stop after possibly seriously injuring a police officer. Therres proceeded to the inaugural stage and took a MPD chemical spray gun from a crowd control bag on the inaugural stage. He sprayed a chemical substance at any police officer within range. His belligerent criminal conduct on January 6, 2021 was the epitome of disrespect for the law.

Therres' criminal history also shows an appalling pattern of disrespect for the law. He has violated multiple court-ordered protective orders entered against him. He has fled from police, committed additional crimes while serving a probationary sentence, had his probation revoked, and has threatened/intimidated witnesses against him. His 2019 felony conviction involved breaking into the apartment of an acquaintance, stealing his electronics, and then attempting to obstruct justice and extort the victim.

A significant sentence of incarceration in this case would promote respect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Therres was the antithesis of a peaceful protestor on January 6, 2021. He willfully joined a violent mob storming the Capitol. He engaged in assaultive acts with dangerous weapons on police officers carrying out their duties and inflicted bodily harm on at least one officer.

As noted in the PSR, Therres has been sentenced to terms of incarceration in the past, but those terms were largely suspended. He has never faced serious consequences that are in line with the seriousness of his behavior. A significant term of incarceration is demonstrably necessary here because just the fact of criminal convictions—even felony convictions—has not proven to be a meaningful deterrent to him. The sentence imposed should be specifically designed to deter Therres from committing further crimes.

---

[9]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *U.S. v. Khater et al.*, 21-cr-222, Judge Hogan sentenced the defendant to 80 months' imprisonment after he pled guilty to violating 18 U.S.C. § 111(a)(1), (b), and 2 for using chemical spray to assault police officers. Like Therres in this case, Khater observed the raging violence occurring against police officers and willingly and voluntarily joined that attack by spraying pepper spray at any officer he could find, causing bodily harm to police officers. The sentence was within the calculated guideline range of 78-97 months.

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Caldwell*, 21-cr-181 (CKK), the defendant also pleaded guilty to violating 18 U.S.C. § 111(b). Before going to the Capitol building on January 6, Caldwell armed himself with bear spray, outfitted himself with glasses that could protect him from some of the effects of pepper spray, and brought a Baofeng handheld two-way radio that could send and/or receive communications during the riot. After spraying a line of officers protecting the Lower West Terrace Plaza area, he made his way to the Capitol Building and entered through the Senate Wing door. During the riot, Caldwell taunted police officers by asking them to spray him and asking if they were "scared." Judge Kollar-Kotelly sentenced Caldwell to 68 months' incarceration and 35 months' probation. Although Caldwell's conduct was highly egregious, he did not throw a large wooden plank at police, striking one of them in the head and knocking the officer unconscious, as Therres did. A longer sentence is appropriate here.

Other Judges in this District have imposed guideline sentences in January 6 officer assault cases. Cody Mattice and James Mault both pleaded guilty to 18 U.S.C. § 111(a) and were sentenced to 44 months incarceration based on a Sentencing Guidelines Range of 37 to 46 months. *See U.S. v. Mattice, et al.*, 21-cr-657 (BAH). Here, the government is recommending a mid- range guideline sentence of 84 months' imprisonment for Therres.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[12] *United States v. Papagno*, 639

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Therres must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Therres played in the riot on January 6.[13] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Therres' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 115.

---

at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1). Although J.W. is an identifiable victim under 18 U.S.C. § 3663A(b)(2), J.W. has not elected to submit a Victim Impact Statement or participate in the sentencing process.

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 84 months' incarceration, which is the middle of the guideline range calculated by the Probation Office, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

On this 17th day of April, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:     */s/ Andrew J. Tessman*
        ANDREW J. TESSMAN
        Assistant United States Attorney
        District of Columbia – Detailee
        West Virginia Bar No. 13734
        300 Virginia Street
        Charleston, WV 25301
        (304) 345-2200
        Andrew.Tessman@usdoj.gov